EXXON CORPORATION, THE BF GOODRICH COMPANY, UNION CARBIDE CORPORATION, MONSANTO COMPANY AND TENNECO CHEMICALS, INC., PLAINTIFFS-APPELLANTS, v. ROBERT HUNT, ADMINISTRATOR OF NEW JERSEY SPILL COMPENSATION FUND; CLIFFORD A. GOLDMAN, TREASURER OF THE STATE OF NEW JERSEY; SIDNEY GLASER, DIRECTOR OF THE DIVISION OF TAXATION, AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

EXXON CORPORATION, THE BF GOODRICH COMPANY, UNION CARBIDE CORPORATION, MONSANTO COMPANY, AND TENNECO CHEMICALS, INC., PLAINTIFFS-APPELLANTS, v. ROBERT HUNT, ADMINISTRATOR OF NEW JERSEY SPILL COMPENSATION FUND; CLIFFORD A. GOLDMAN, TREASURER OF THE STATE OF NEW JERSEY; SIDNEY GLASER, DIRECTOR OF THE DIVISION OF TAXATION; JERRY F. ENGLISH, COMMISSIONER OF ENVIRONMENTAL PROTECTION; AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued February 17, 1987—Decided December 2, 1987.

*John J. Carlin, Jr.*, argued the cause for appellants (*John J. Carlin, Jr.*, attorney; *John J. Carlin, Jr.*, and *Donald J. Fay*, on the brief).

*Mary R. Hamill*, Deputy Attorney General, argued the cause for respondents (*W. Cary Edwards*, Attorney General of New Jersey, attorney; *Deborah T. Poritz*, Assistant Attorney General, of counsel; *Mary R. Hamill* and *Nancy B. Stiles*, Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

STEIN, J.

This case is before us for the second time. Initially, we affirmed the judgment of the Appellate Division upholding the Tax Court's determination that the tax imposed by the New Jersey Spill Compensation and Control Act, *L.*1976, *c.* 141 (codified as amended at *N.J.S.A.* 58:10-23.11 to -23.24, -23.34) (Spill Act), was not pre-empted by the federal government's adoption of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub.L. No. 96-510, 94 Stat. 2767 (codified as amended at 42 *U.S.C.A.* §§ 9601-9675) (CERCLA). *Exxon Corp. v. Hunt,* 97 *N.J.* 526 (1984).

The United States Supreme Court, affirming in part and reversing in part, concluded that the tax levied by the Spill Act was imposed for certain purposes that were pre-empted by CERCLA, as well as for other purposes not pre-empted by CERCLA. *Exxon Corp. v. Hunt,* 475 *U.S.* 355, 106 *S.Ct.* 1103, 89 *L.Ed.*2d 364 (1986). Accordingly, the Supreme Court remanded the matter to this Court to determine "the state law question whether, or to what extent, the non pre-empted provisions of the statute are severable from the pre-empted provisions," *id.* at 376, 106 *S.Ct.* at 1116, 89 *L.Ed.*2d at 382, "and for further proceedings not inconsistent with this opinion." *Id.* at 377, 106 *S.Ct.* at 1117, 89 *L.Ed.*2d at 383.

We then remanded the matter to the Tax Court to develop a record and to make recommended findings, otherwise retaining jurisdiction. —— *N.J.* —— (1986). Pursuant to our order, the Tax Court has submitted the following recommended findings:

    1. The decision of the United States Supreme Court should not be applied prospectively but should be retroactive to July 16, 1982 with respect to expenditures made on preempted removal purposes and to September 8, 1983 as to preempted remedial expenses.

    2. The non-preempted purposes of the Spill Act are severable from the purposes found to be preempted by the United States Supreme Court.

    3. Plaintiffs' claims for refunds should not be defeated by reason of their failure to comply with the procedural requirements of *N.J.S.A.* 54:49-14.

    4. Following an accounting, (and plenary hearing if necessary) to determine the amount of monies paid for material purchased and services rendered for

preempted removal purposes on or after July 16, 1982 and for preempted remedial purposes on or after September 8, 1983 to March 10, 1986, (date of the United States Supreme Court decision), the Legislature should be permitted a reasonable period of time to reimburse the fund for the preempted amounts expended.

(a) If, following such reimbursement, the amount of the fund exceeds the cap established by the Legislature, such excess should be paid to plaintiffs.

(b) Should the required reimbursement not be made, the amount of preempted expenditures should be refunded to plaintiffs.

(c) Such refunds should be made in proportion to the tax paid by each plaintiff to the total tax collected.

5. Defendants should not be enjoined from enforcing payment of the spill fund tax by plaintiffs. [— *N.J. Tax* —, — (Tax Ct. 1986) (slip op. at 38, 39).]

We now modify and, as modified, adopt the recommended findings of the Tax Court.

I

The procedural history and facts pertinent to the pre-emption issue are set forth in the prior opinions of this Court and the United States Supreme Court. They need be restated here only to the extent necessary to frame the unique issue that confronts us in respect of the Supreme Court's remand.

The purpose of the Spill Act, enacted in 1977, was to finance prevention and cleanup of oil spills and hazardous substance discharges because of their adverse effects on the state's environment and economy. *N.J.S.A.* 58:10-23.11a. The Act levied an excise tax on major chemical and petroleum facilities within the state, and the proceeds of the tax have been deposited into a permanent fund (Spill Fund) to implement the legislative goals. *N.J.S.A.* 58:10-23.11h. The Spill Fund may be expended primarily to clean up discharges of hazardous substances, to compensate third parties for economic losses resulting from such discharges, and for research and administrative costs. *N.J.S.A.* 58:10-23.11o. Tax collections during Spill Fund fiscal years from 1978 through 1985 averaged slightly less than 10 million dollars annually.

Congress enacted CERCLA in 1980, providing for the establishment over a five-year period of a 1.6 billion dollar trust

fund, commonly known as Superfund. 87.5% of Superfund was raised primarily by federal excise taxes on petroleum and chemicals,[1] and the balance by appropriations from general revenues. Superfund's resources may be expended for two primary purposes: the first, "governmental response," encompasses both "removals" of released hazardous substances in the nature of a "short term" cleanup, 42 *U.S.C.A.* § 9601(23), and "remedial action," to achieve a "permanent remedy" for released hazardous substances. 42 *U.S.C.A.* § 9601(24). Secondly, Superfund may pay claims, consisting either of reimbursement to private parties for hazardous substance cleanup costs consistent with the national contingency plan, or reimbursement to the federal or a state government to compensate for damages to natural resources. 42 *U.S.C.A.* § 9611(a)(2)–(3). Unlike Spill Fund, Superfund resources cannot be used to clean up oil spills or to compensate third parties for economic losses caused by hazardous substance discharges.

The pre-emption issue that was resolved by the Supreme Court's decision concerned the proper interpretation of § 114(c) of CERCLA, 42 *U.S.C.A.* §§ 9614(c). That section, since repealed in its entirety by § 114(a) of the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. 99–499, 100 Stat. 1652 (codified at 42 *U.S.C.A.* § 9614(c)), provided as follows:

> Except as provided in this chapter, no person may be required to contribute to any fund, the purpose of which is to pay compensation for claims for any costs of response or damages or claims which may be compensated under this subchapter. Nothing in this section shall preclude any State from using general revenues for such a fund, or from imposing a tax or fee upon any

---

[1]The federal excise tax on petroleum is currently at the rate of 0.79 cent a barrel and on chemicals at rates ranging from 0.22 cent to $4.87 per ton. 26 *U.S.C.A.* § 4611. Under the Spill Act, as originally enacted, the basic tax rate was .01 cent per barrel on petroleum products, and on non-petroleum products the greater of .01 cent per barrel or .4% of fair market value. *L.*1976, *c.*141, § 9. As amended by *L.*1986, *c.*143, § 2, the tax rate is .0125 cent per barrel on petroleum products, and on nonpetroleum products the greater of .0125 cent per barrel or 1% of fair market value. *N.J.S.A.* 58:10–23.11h.

person or upon any substance in order to finance the purchase or prepositioning of hazardous substance response equipment or other preparations for the response to a release of hazardous substances which affects such State.

The New Jersey Attorney General's contention was that the pre-emption language should be construed to prohibit only payments to a fund to be used for purposes that are actually compensated by Superfund. The Supreme Court rejected that construction and concluded that § 114(c) pre-empted "any fund intended, in whole or in part, to pay for the same types of expenses that may be paid by Superfund," 475 *U.S.* at 370, 106 *S.Ct.* at 1113, 89 *L.Ed.*2d at 379, whether or not Superfund actually paid such expenses.

With respect to the parameters of pre-emption the Court's opinion implicitly acknowledged that CERCLA itself does not set forth criteria for determining which removal and remedial expenses and which natural resource claims "may be compensated" by Superfund. Accordingly, since such criteria are set forth in the National Contingency Plan (NCP) required by CERCLA to be revised to reflect its provisions, 42 *U.S.C.A.* § 9605(a)(8)(B), the Court held that "the NCP provides the appropriate measure of whether a given expenditure constitutes 'costs of response or damages or claims which may be compensated' by Superfund." 475 *U.S.* at 375, 106 *S.Ct.* at 1116, 89 *L.Ed.*2d at 382.

The Court conceded that CERCLA did not pre-empt expenditures authorized by the Spill Act for the following purposes: to compensate third parties for damage resulting from hazardous substance discharges; to pay personnel and equipment costs; to administer the fund itself; and to conduct research. *Id.* at 375, 106 *S.Ct.* at 89 *L.Ed.*2d at 382. In addition, the Court specifically excluded the required State contribution to the cost of remedial actions, 42 *U.S.C.A.* § 9604(c)(3)(C), from those costs that "may be compensated" by Superfund.

The Court concluded that the Spill Act was pre-empted by § 114(c) of CERCLA to the extent that the Act authorized expenditures, beyond the mandatory state share, "for remedial

costs for sites on the National Priority List, or for removal costs that are eligible for Superfund compensation under the terms of the NCP." 475 *U.S.* at 376, 106 *S.Ct.* at 1116, 89 *L.Ed.*2d at 382.

## II

### *Recommendations of the Tax Court*

No testimony was elicited in the course of the remand proceedings before the Tax Court. As a result, the record on remand consists solely of affidavits and exhibits submitted by the parties in support of various motions filed with the Court.

#### (a) *Severability*

■ We are in full accord with the Tax Court's conclusion that the purposes of the Spill Act held to be pre-empted may be severed from the remainder of the statute without impairing its validity.

The critical standard for determining issues of severability is the presumed intent of the Legislature. "That intent must be determined on the basis of whether the objectionable feature of the statute can be excised without substantial impairment of the principal objects of the statute." *Affiliated Distillers Brands Corp. v. Sills,* 60 *N.J.* 342, 345 (1972); *accord New Jersey Chapter, Am. Inst. of Planners v. New Jersey State Bd. of Prof. Planners,* 48 *N.J.* 581, 593, *cert. denied,* 389 *U.S.* 8, 88 *S.Ct.* 70, 19 *L.Ed.*2d 8 (1967); *Lane Distributors, Inc. v. Tilton,* 7 *N.J.* 349, 369–70 (1951); 2 *Sutherland, Statutory Construction* § 44.03 (C. Sands 4th ed. 1986) at 483. As we explained in *State v. Lanza,* 27 *N.J.* 516 (1958),

[A]n unconstitutional provision in a statute does not affect the validity of a separate article or clause of the enactment, if otherwise valid, unless the two are so intimately connected and mutually dependent as reasonably to sustain the hypothesis that the Legislature would not have adopted the one without the other. Where the principal object of the statute is constitutional, and the objectionable provision can be excised without substantial impairment of the general purpose, the statute is operative except insofar as it may contravene fundamental law. [*Id.* at 528.]

In this unusual setting, the inquiry is whether the Legislature would have intended the nonpre-empted portions of the Spill Act, including the tax rate, to remain in effect notwithstanding the determination that significant statutory purposes were pre-empted by CERCLA *for a limited period.* (*See* discussion as to the period of pre-emption, *infra* at 121–127). Plaintiffs argued in the Tax Court and before us that severability is inappropriate where, as here, a single tax rate was struck by the Legislature to fund both pre-empted and nonpre-empted purposes. We are not persuaded, however, that the valid purposes of a taxing statute are not severable from the invalid ones simply because all of the statutory objectives are financed by the same tax. Rather, the entire statutory scheme must be analyzed in order to ascertain the probable intent of the Legislature as to severability. The guiding principle was succinctly stated by Judge Gibbons in *Chamber of Commerce v. Hughey,* 774 *F.*2d 587, 597 (3d Cir.1985): "This [severability] is largely a question of whether the statute will continue to make sense after the challenged portion is excised."

We observe initially that the Spill Act contains a standard severability clause. *N.J.S.A.* 58:10–23.11w. However, the inclusion or exclusion of such a clause does not ordinarily resolve the issue. *See State v. Lanza, supra,* 27 *N.J.* at 527.

We also note the Legislature's comprehensive objectives in passing the Spill Act:

> The Legislature finds and declares that the discharge of petroleum products and other hazardous substances within or outside the jurisdiction of this State constitutes a threat to the economy and environment of this State. The Legislature intends by the passage of this act to exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damaged by such discharge. [*N.J.S.A.* 58:10–23.11a.]

To implement these wide-ranging goals, the Act authorizes the Department of Environmental Protection (DEP) to clean up hazardous discharges either by using the resources of the Spill

Fund or by directing the discharger to perform the work at its own expense. *N.J.S.A.* 58:10–23.11f. The fund also can be used to reimburse innocent third parties for cleanup and removal costs incurred by them, and to pay direct and indirect damages sustained because of hazardous substance discharges. *N.J.S.A.* 58:10–23.11g. The Act imposes joint and several liability on dischargers of hazardous substances, without regard to fault, for all cleanup and removal costs, *N.J.S.A.* 58:10–23.11g, and authorizes the imposition of treble damages on a discharger who fails to comply with a directive to clean up a hazardous-substance discharge. *N.J.S.A.* 58:10–23.11f–a. The Spill Fund's authorized uses were summarized in the Supreme Court's opinion:

> As we have explained above, the Spill Fund may be used for six purposes: (1) to finance governmental cleanup of hazardous waste sites; (2) to reimburse third parties for cleanup costs; (3) to compensate third parties for damage resulting from hazardous substance discharges; (4) to pay personnel and equipment costs; (5) to administer the fund itself; and (6) to conduct research. [475 *U.S.* at 375, 106 *S.Ct.* at 1116, 89 *L.Ed.*2d at 382.]

It is also significant that the Legislature, when it adopted the Spill Act, knew that federal funding for hazardous-waste cleanup was possible and that such funding might warrant modification of the authorized purposes of the Spill Act. Section 27 of the Act provides:

> If the United States Congress enacts legislation providing compensation for the discharge of petroleum and hazardous products, the commissioner shall determine to what degree that legislation provides the needed protection for our citizens, businesses and environment and shall make the appropriate recommendations to the Legislature for amendments to this act. [*L.*1976, *c.* 141, § 27 (codified at *N.J.S.A.* 58:10–23.11z).]

Also pertinent to the question of severability is the provision in the Spill Act as originally enacted, *L.*1976, *c.* 141, § 9, suspending the collection of taxes whenever the Spill Fund attains certain prescribed levels.[2] Although these tax-suspen-

---

[2] In its original form, *N.J.S.A.* 58:10–23.11h provided, in part:

b. * * * In each fiscal year following any year in which the balance of the fund equals or exceeds $50,000,000.00, no tax shall be levied unless (1)

sion provisions of the Act were repealed as of February 1, 1987, *L*.1986, *c.* 143, § 2 (codified at *N.J.S.A.* 58:10–23.11h-b), they were in effect during the entire period of pre-emption. Accordingly, the Spill Act had a self-correcting mechanism that would suspend tax collections when existing funds were adequate to discharge the statutory objectives. These provisions appear to reflect the Legislature's assumption that if the demands on the Spill Fund were less expansive than originally contemplated, the impact of the prescribed tax rate on the oil and chemical industry would be alleviated by the tax-suspension provisions built into the Act. Although undoubtedly not adopted in anticipation of a holding that certain statutory objectives were preempted by CERCLA, the presence of the tax-suspension mechanism persuasively suggests that the tax-rate provisions of the Act are not inconsistent with a determination that the nonpreempted purposes of the Spill Act are severable from the preempted purposes during the limited period of pre-emption.

We are also informed by the uncontroverted affidavit of Michael E. Catania, Deputy Commissioner of the DEP, filed with the Tax Court in support of the State's motion seeking severability and prospective application of the Supreme Court's decision, that the Spill Fund will require approximately 340 million dollars during the five fiscal years beginning with 1987 to pay for "nonpre-empted" type expenditures. Of this

the current balance in the fund is less than $40,000,000.00 or (2) pending claims against the fund exceed 50% of the existing balance of the fund. The provisions of the foregoing notwithstanding, should claims paid from or pending against the fund not exceed $5,000,000.00 within 3 years after the tax is first levied, the tax shall be $0.01 per barrel transferred or 0.4% of the fair market value of the product, as the case may be, until the balance in the fund equals or exceeds $36,000,000.00, and thereafter shall not be levied unless: (1) the current balance in the fund is less than $30,000,000.00 or (2) pending claims against the fund exceed 50% of the existing balance of the fund. In the event of either such occurrence and upon certification thereof by the State Treasurer, the director shall within 10 days of the date of such certification relevy the excise tax, which shall take effect on the first day of the month following such relevy. * * *

amount, 200 million dollars is projected as the cleanup cost for sites ineligible for Superfund reimbursement and 140 million dollars as the anticipated State share of cleanup costs at Superfund-eligible sites. The affidavit also identified anticipated increases in administrative costs and in the cost of reimbursement of third-party claims. The affidavit states that the projected needs of the Spill Fund for nonpre-empted purposes are substantially higher than the anticipated revenue from the then current tax rate.

As forecast by the Catania affidavit, the Legislature has recently recognized the enhanced needs of the Spill Fund by increasing the tax rate, and broadening the tax base by redefining "major facility" to include a greater number of oil and chemical companies. *L.*1986, *c.* 143, § 2 (codified at *N.J.S.A.* 58:10–23.11h). The Legislature's commitment of additional resources to the Spill Fund, after the Supreme Court's pre-emption decision, demonstrates plainly that the Legislature's assumption in 1986 was that the Spill Act remained in effect, notwithstanding the Court's conclusion that a portion of the act's objectives had been pre-empted for a limited period.[3]

Accordingly, we are convinced on the basis of the overall structure of the Spill Act, its comprehensive purpose to facilitate the statewide cleanup of hazardous-substance discharges, and the continuing commitment of the Legislature to provide adequate resources for the Spill Fund that severability of the nonpre-empted provision of the Spill Fund, during the limited period of pre-emption, is manifestly consistent with the legislative intent. The Spill Act "makes sense," *Chamber of Commerce v. Hughey, supra,* 774 *F.*2d at 597, with or without the pre-empted purposes.

---

[3]*L.*1986, *c.*143 was enacted after Congress adopted the Superfund Amendments & Reauthorization Act of 1986, which repealed the pre-emption provision in CERCLA. 42 *U.S.C.A.* § 9614(c). Nevertheless, it is self-evident that the Legislature assumed that the Supreme Court's decision did not invalidate the Spill Act in its entirety.

### (b) *Period and Scope of Pre-emption*

The conclusion that the pre-empted purposes of the Spill Act are severable from the nonpre-empted provisions requires that we determine the period and scope of pre-emption and, based on that determination, the appropriate relief. The positions of the parties conflict sharply. The State argues that the Supreme Court's decision should be given only prospective application, with the result that the period of pre-emption would begin on March 10, 1986 (the date of the Court's decision), and would end on October 17, 1986, the effective date of SARA. If its position on prospectivity is rejected, the State supports the Tax Court's determination that promulgation of the NCP and the NPL mark the commencement period for pre-emption of removal and remedial actions respectively, but the State argues that the pre-emption period should end on September 30, 1985, the date on which CERCLA's taxing authority expired.

Plaintiff's position is that the effective date of the Supreme Court's holding that the Spill Act was partially pre-empted by CERCLA must be December 11, 1980, the date of CERCLA's enactment. Plaintiffs point to section 302(a) of CERCLA, 42 *U.S.C.A.* § 9652(a), which states that "unless otherwise provided, all provisions of [CERCLA] shall be effective on December 11, 1980." Moreover, plaintiffs argue that the Supreme Court's references to the NCP and NPL were intended solely to provide a frame of reference for determining *whether* the Spill Act established a fund that was devoted to pre-empted purposes, but were not intended to imply that the effective date of pre-emption depended on promulgation of the NCP and NPL. Plaintiffs further contend that on CERCLA's enactment New Jersey had "adequate guidance" to know what sites would be eligible for Superfund reimbursement and "could have amended the Spill Act so as not to violate Section 114(c)."

■ We are in full accord with the Tax Court's conclusion that the Supreme Court's decision in this case should not be restricted to prospective application. Although the Supreme

Court's opinion is silent on the issue of retrospective application, the remand to this Court to determine severability and "for further proceedings" carries with it the implicit direction that we determine the relief appropriate to the holding that the Spill Act is partially pre-empted. If the Court conceived that its decision might apply only prospectively, which would significantly affect the remedy we must fashion, it is reasonable to assume that the opinion would at least have adverted to that possiblility. *See Lemon v. Kurtzman,* 411 *U.S.* 192, 198–99, 93 *S.Ct.* 1463, 1468, 36 *L.Ed.*2d 151, 160 (1973) (*Lemon II*) (holding that there are no absolute principles available to determine whether a given constitutional ruling should be applied retroactively and that equitable principles and the totality of circumstances should guide such determinations); *accord Coons v. American Honda Motor Co., Inc.,* 96 *N.J.* 419 (1984) (*Coons II*).

Moreover, we agree with the Tax Court that an indispensable prerequisite to prospectivity is not present in this case, since the Supreme Court's opinion did not "establish a new principle of law, either by overruling clear past precedent on which litigants may have relied * * * or by deciding an issue of first impression whose resolution was not clearly foreshadowed * * *." *Chevron Oil Co. v. Huson,* 404 *U.S.* 97, 106, 92 *S.Ct.* 349, 355, 30 *L.Ed.*2d 296, 306 (1971) (citations omitted). Here, the Supreme Court relied upon a settled legal principle—the preeminence of federal legislation under the supremacy clause, article VI, clause 2 of the United States Constitution—and applied it by construing section 114(c) of CERCLA as pre-empting certain provisions of the Spill Act. No "clear past precedent" was overruled nor could the question of statutory interpretation fairly be considered an "issue of first impression whose resolution was not clearly foreshadowed," as that phrase was used in *Chevron.* The purpose of the *Chevron* test is the avoidance of prejudice arising from judicial decisions that interested parties could not fairly have anticipated. In this case the issue of statutory interpretation was susceptible to either of

two resolutions, one advanced by the State and the other advanced by plaintiffs. The Court's holding that CERCLA partially pre-empted the Spill Act was not sufficiently unpredictable to satisfy this aspect of the *Chevron* criteria. Accordingly, we conclude that an exclusively prospective application of the Court's decision is inappropriate under these circumstances.

We also agree with the Tax Court's conclusion that the Environmental Protection Agency's (EPA) promulgation of the NCP and the NPL marked the critical dates on which pre-emption of remedial and removal expenditures, respectively, shall be deemed to have commenced. The NCP sets forth detailed criteria for determining whether removal actions may be financed by Superfund, imposes limits on the cost and duration of most removal actions, and prescribes the conditions under which such limits may be exceeded. 40 *C.F.R.* § 300.65(b)(2) and (3) (1987). In addition, the NCP limits Superfund-financed remedial actions to sites listed on the NPL, 40 *C.F.R.* § 300.68(a) (1987), which was initially promulgated in September 1983 and thereafter amended and supplemented to include additional sites.

Plaintiffs, arguing that CERCLA's effective date of December 11, 1980, is necessarily the date of pre-emption, contend that New Jersey could have anticipated the impact of the NCP and NLP. Plaintiffs assert that two of New Jersey's worst sites had qualified prior to May 1981 for an unspecified amount of funding under the Clean Water Act, 33 *U.S.C.A.* §§ 1251–1376; the implication is that qualification of such sites for Superfund reimbursement was therefore inevitable. Plaintiffs also observe that four New Jersey sites had qualified in 1981 to receive money from Superfund for study and design work, and that a substantial number of New Jersey sites received high rankings on a list of EPA Region II sites designated as "candidates" for remedial funding under Superfund.

In response, the affidavit of defendant Robert E. Hunt, Administrator of Spill Fund from 1978 to 1986, described the

difficulty experienced by DEP officials in 1981 and 1982 because "the scope of the federal program had not been defined and Superfund financing decisions appeared to be made by EPA on a case by case basis." According to Hunt, "there was virtually no money available from Superfund at this time and no real guidance from USEPA as to what activities would eventually be funded."

We need not resolve the conflict whether DEP, from the date of CERCLA's enactment, knew or should have known those hazardous waste sites that would be the inevitable beneficiaries of Superfund's resources. Suffice it to say that the manner in which Superfund was administered at that time leaves us highly skeptical that its operational parameters could readily have been forecast by anyone outside the EPA. A typical account of Superfund's operations during this period is contained in a House Report, accompanying a predecessor bill to the Superfund Amendments and Reauthorization Act of 1986:

The resources given to EPA were simply inadequate to fulfill the promises that were made to clean up abandoned hazardous wastes in this country. With political pressure on EPA to treat every site discovered as a high priority, EPA was virtually guaranteed to fail from the moment CERCLA passed in 1980.

To compound the problem the first administrator of the Superfund program undermined the intent of the program. Under the initial leadership of Assistant Administrator Lavelle, the program was victimized by gross mismanagement and policies which limited expenditures for site cleanups, in part in an effort to dissuade Congress from extending the funding for the program beyond its scheduled expiration date of October 1, 1985. [H.R.Rep. No. 253, 99th Cong., 1st Sess., pt. 1 at 55 (1985) *reprinted in* 1986 U.S.Code Cong. & Ad.News 2835.]

In any event, we are satisfied that the Supreme Court's reference to the NCP, supplemented by the NPL, as providing "criteria that determine what expenses, at which sites, will be eligible for Superfund money" was intended to demonstrate that the pre-emption period did not commence before these guidelines were promulgated. The Court explained that

[h]aving decided that "may be compensated" should be given its ordinary meaning, we must define the category of expenses that may be compensated by Superfund. Fortunately, CERCLA itself furnishes an appropriate test. Section 105(8)(B) of CERCLA, 42 USC § 9605(8)(B) requires the President to revise the National Contingency Plan (NCP) to reflect CERCLA's provisions. As part

of that revision, the President must create and revise annually a list of sites most in need of federal efforts, now known as the National Priorities List. The NCP currently specifies that removal, or immediate cleanup, will be financed by Superfund only in emergency situations, see 40 CFR § 300.65 (1985). Remedial action will be financed only for sites on the National Priorities List, id., § 300.68(a). Finally, the Environmental Protection Agency, pursuant to the NCP, has proposed criteria for the use of Superfund money for natural resource claims. See 50 Fed Reg 9593 (1985). The NCP, therefore, provides criteria that determine what expenses, at which sites, will be eligible for Superfund money. We therefore conclude that the NCP provides the appropriate measure of whether a given expenditure constitutes "costs of response or damages or claims which may be compensated" by Superfund. [475 *U.S.* at 374–75, 106 *S.Ct.* at 1115–16, 89 *L.Ed.*2d at 381–82 (footnote omitted).]

We find the clear thrust of the Supreme Court's opinion to be that although CERCLA established the *principle* of pre-emption, the scope of pre-emption is a regulatory rather than statutory determination. Accordingly, until the NCP was first promulgated by the EPA on July 16, 1982, 47 Fed.Reg. 31,180 (1982), and then revised on September 8, 1983, to include the first NPL, 48 Fed.Reg. 40,669 (1983), no agency guidelines existed to determine those remedial or removal actions that would be *eligible* for Superfund reimbursement, and for which funding by the Spill Fund was thereby pre-empted.

We reject the State's assertion that pre-emption should cease as of September 30, 1985, the date on which taxing authorization under CERCLA expired. 42 *U.S.C.A.* § 9653 (repealed by Pub.L. 99–499 § 571(b), 100 Stat. 1761 (1986)). From that date until enactment of SARA on October 17, 1986, CERCLA was funded by emergency appropriations. We can discern no clear congressional intention to terminate pre-emption for the brief period during which CERCLA was financed temporarily by appropriations from general revenues rather than by excise taxes on petroleum and chemicals. Accordingly, we hold that the period of pre-emption ended on October 27, 1986, the effective date of SARA, which repealed the pre-emption language in § 114(c) of CERCLA.

Our conclusions concerning the scope and period of pre-emption will require that this matter be remanded once again to the

Tax Court. The purpose of the remand will be to permit the parties to establish a record upon which the Tax Court can determine the amount of Spill Fund expenditures that was pre-empted by CERCLA. In that connection, the State points out that establishing the beginning and end of the pre-emption period does not necessarily determine whether a particular expense incurred or paid by Spill Fund during the pre-emption period should be treated as a "pre-empted" expense. The State contends that work authorized, commenced, or completed before the pre-emption period began, but paid for during the pre-emption period, should not be deemed pre-empted.

We are generally in accord with the State's position. If expenses to remove or remediate hazardous waste that are paid by Spill Fund before pre-emption began are not inconsistent with CERCLA, it should follow that expenses committed *before* but paid *after* the effective date of pre-emption should not be treated as pre-empted. The principle is that the Spill Fund's expenditures should not be deemed pre-empted by CERCLA unless the essential decision to commit the funds was made *after* promulgation of the NCP [4] or NPL,[5] as the case may be. We leave to the Tax Court on remand the task of determining precisely those expenditures that were permissible and those that were pre-empted.

---

[4] As noted, the effective date of pre-emption of removal actions that meet the criteria of the NCP is July 16, 1982. We note the State's reference, in its Exceptions to the Recommendations of the Tax Court, to objections communicated to EPA concerning the vagueness of the criteria for authorization of removal actions and the EPA's response to the effect that the criteria are adequate. It is self-evident that expenditures by the Spill Act for removal actions that EPA determined to be unauthorized by the NCP criteria are not pre-empted. In cases where EPA has not determined eligibility of a removal action pursuant to the NCP criteria, the Tax Court on remand must make that evaluation in order to determine if the expenditure was pre-empted.

[5] The effective date of pre-emption of remedial actions for sites on the NPL is the date of promulgation of the NPL, or any amendment or supplement thereof, on which such site is first listed.

*Remedy*

Preliminarily, we note our full accord with the Tax Court's conclusion that any technical noncompliance by plaintiffs with the provisions of *N.J.S.A.* 54:49–14 does not affect plaintiffs' right to relief. —— *N.J. Tax* at —— (slip op. at 28).

The remedy recommended by Judge Evers is thoughtful and practical. Essentially, the Tax Court proposed that an accounting or hearing be conducted to determine the amount of the pre-empted expenditures by the Spill Fund. The Legislature would then be accorded a reasonable time period to reimburse the Spill Fund for the entire pre-empted amount, using any source of funds other than the tax imposed by the Spill Act. If the Legislature does not reimburse the Spill Fund within the designated period, the Tax Court proposed that plaintiffs receive a refund of so much of the pre-empted expenditures as bears the same proportion to the total pre-empted expenditures as the Spill Act taxes paid by plaintiffs bears to the total amount of Spill Act taxes collected. In addition, the Tax Court recommended that if the Legislature reimbursed the Spill Fund and the reimbursement caused the amount of the Fund to exceed the statutory cap originally imposed by the Spill Act, *see supra* at 119, the entire excess over the cap would be paid to plaintiffs.

█ In considering the appropriateness of the Tax Court's recommendations as to remedy, we accept plaintiff's premise that ordinarily a taxpayer that pays a tax found to be invalid is entitled to a refund. *Mayor of Jersey City v. Riker,* 38 *N.J.L.* 225, 227 (Sup.Ct.1876); *accord In Re Fees of State Bd. of Dentistry,* 84 *N.J.* 582, 587 (1980); *Milmar Estate, Inc. v. Borough of Fort Lee,* 36 *N.J.Super.* 241 (App.Div.1955). In this litigation, however, we must address a tax that has been invalidated only in part, and for a limited period. Furthermore, in framing the appropriate relief we are obliged to consider the context in which repeal of the limited pre-emption of the Spill Act occurred.

The background and need for the Superfund Amendments and Reauthorization Act, which appropriated $9 billion in additional funding to clean up hazardous waste sites, is summarized in the report of the House of Representatives Science and Technology Committee referred to above, *see supra* at 124, that accompanied H.R. 2817, a predecessor to the bill ultimately enacted by Congress:

> The Superfund program to clean up abandoned hazardous waste sites is one of the Nation's most important environmental programs designed to protect human health and the environment. It is also the most beleagered program the Environmental Protection Agency (EPA) administers. If enacted, H.R. 2817 would give EPA the flexibility to revitalize the Superfund program, ensure cleanup of abandoned hazardous chemicals, and protect human health and the environment.
>
> Superfund was passed in 1980 to address what many believed was a relatively limited problem. The EPA was instructed to find 400 hazardous waste sites. Most believed that cleaning up a site was relatively inexpensive and involved removing containers or scraping a few inches of soil off the ground. The Agency was given $1.6 billion to administer the cleanup of the 400 sites.
>
> Today, five years later, our understanding of the problem posed by abandoned hazardous chemicals is entirely different. The Office of Technology Assessment now estimates there may be as many as 10,000 Superfund sites across the Nation, or an average of 23 sites per Congressional district. These sites range from industrial plants to river beds to city dumps where small businesses and households have disposed of solvents, paints and cleaning fluids. We now understand that a cleanup frequently goes far beyond simple removal of barrels. It often involves years of pumping contaminated water from aquifers. The total cost of completing the Superfund program is estimated to be as much as $100 billion. The total time will be decades.

> *    *    *    *    *    *    *    *

> The current reauthorization, coming when it does, forces Congress to face a very fundamental policy question: how to ensure in the future that there are adequate resources, and to see that past, thoroughly repudiated, mismanagement problems are behind us.
>
> H.R. 2817 has been written with the underlying belief that Congress should focus on ways to ensure rapid and thorough cleanup of abandoned hazardous wastes rather than on past mistakes. It is clear from the accumulating data on waste sites that EPA will never have adequate monies or manpower to address the problem itself. As a result, an underlying principle of H.R. 2817 is that Congress must facilitate cleanups of hazardous substances by the responsible parties while assuring a strong EPA oversight role with a set of tough legal enforcement standards. Equally important is the role of the communities around Superfund sites. It is here that we can ensure that cleanups and

post-cleanup maintenance of the sites are carried out in compliance with the cleanup agreements for the sites. [H.R.Rep. No. 253, *supra,* at 54.]

In this connection, the repeal of section 114(c), the pre-emption provision of CERCLA, was explained by the Senate Committee on Environment and Public Works in its report on S.51, another predecessor to SARA:

Clarification of section 114(c) appears desirable because of the litigation that has arisen from the original language in the statute. The litigation has been focused on the right of States to tax those substances which are taxed under the Federal Superfund law. To date, all decisions in State courts (including recent State Supreme Court rulings) have found that the Federal Superfund law does not preempt the rights of the States to raise taxes from these substances or through other special taxes. This litigation could continue for years. Any cloud of uncertainty over the legitimacy of these taxes should be removed at the earliest possible time.

*It is widely recognized that States must develop their own taxes to meet their responsibilities for the State share of the cleanup costs at Superfund sites. In addition, States have responsibilities for managing and cleaning up hazardous materials not covered by the Federal program.* Clarification of section 114(c) will allow the State to move forward and develop the tax mechanisms necessary for meeting the growing funding needs for response to hazardous substance releases and participation in the Superfund program, as well as for maintaining effective State hazardous waste programs.

The primary effect of the amendment will be to remove a potential barrier to the creation of State superfund programs. The amendment may result in an increase in the number and pace of hazardous substance response actions undertaken or partially funded by States, since States will be able to raise funds to assist such hazardous substance response. [S.Rep. No. 11, 99th Cong., 1st Sess. at 59, 60 (1985), *reprinted in* 1986 U.S.Code Cong. & Ad.News 2835 (emphasis added).]

In the course of Senate debate on S.51, Senator Lautenberg of New Jersey offered this explanation for the proposed repeal of section 114(c):

Mr. President, S. 51 clearly addresses an issue that has hindered State efforts to set up their own superfunds. Because of a suit filed in New Jersey, which questioned the right of a State to tax the same sources taxed by the Federal Superfund, State Superfund programs have had a cloud over them. This has certainly been the case in New Jersey, where the State was extremely reluctant to spend funds out of our spillfund without this litigation being settled. S. 51 strikes the so-called preemption language in existing law which created this legal ambiguity. Approval of the bill will end years of litigation and free States to conduct aggressive cleanup programs with their own funds. [116 Cong.Rec. S11,581 (daily ed. Sept. 17, 1985 at S 11581).]

Subsequently, in the debate on the conference report of SARA, Senator Lautenberg stated that the repeal of section 114(c) would

[o]verturn the Supreme Court's Exxon versus Hunt decision, which preempted State taxing authority for State spill funds, such as New Jersey's. This provision is critical to New Jersey's plans for complementing the Federal Superfund Program with a State supported cleanup program. [135 Cong.Rec. S14,912 (daily ed. Oct. 3, 1986).]

These excerpts from the legislative history of SARA reflect Congress's recognition not only of the enormity of the hazardous waste cleanup problem but also of the importance of State and local cooperation to assist the federal government in this complex and difficult undertaking. It is obvious that the repeal of section 114(c) was intended to encourage and facilitate State participation in the long-term cleanup effort.

Under these circumstances, we are constrained to fashion a remedy for the collection of Spill Act taxes during the pre-emption period that least offends the congressional purpose in repealing pre-emption. On another recent occasion involving an invalid tax statute, we used our equitable powers to construct a remedy consistent with the attendant circumstances. *See Salorio v. Glaser,* 93 *N.J.* 447, *cert. denied,* 464 *U.S.* 993, 104 *S.Ct.* 486, 78 *L.Ed.*2d 682 (1983) (holding unconstitutional the imposition of the Emergency Transfer Tax on New York residents who commuted to work in New Jersey, but restricting decision to prospective application). As we observed in *Salorio,* "Equitable remedies * * * 'are a special blend of what is necessary, what is fair, and what is workable,' " *id.* at 464 (quoting *Lemon v. Kurtzman (Lemon II), supra,* 411 *U.S.* at 200, 93 *S.Ct.* at 1469, 36 *L.Ed.*2d at 161).

Accordingly, we conclude that under these unique circumstances the appropriate remedy in this matter is that which best implements the intent of Congress in adopting SARA and the intent of the Legislature in adopting and amending the Spill Act. The uncontradicted record before us indicates that the Spill Fund's needs are likely to exceed its resources for some

time. The Legislature has only recently increased both the tax rate and the tax base in order to augment the Spill Fund's revenues. Congress has evidenced its intention to encourage an enhanced State role in hazardous waste cleanup.

In this setting, a partial tax refund to plaintiffs should be a remedy of last resort. Instead, we adopt that part of the Tax Court's recommendation that conditions the payment of a pro-rata refund upon the Legislature's failure to reimburse the Spill Fund for the amount of expenditures found to be pre-empted. In our view, reimbursement of the Spill Fund from non-Spill Act revenues vindicates the Spill Fund's payment of pre-empted expenses in a manner most consistent with the objectives of Congress and the Legislature. We conclude that a period of six months from the final determination of the amount of pre-empted expenditures, from which no appeal is pending or can be taken, is sufficient for the Legislature to take action to reimburse the fund. In this connection, we hold that reimbursement of the Spill Fund must be for the entire amount of pre-empted expenditures, and reject the State's contention that pro-rata reimbursement proportionate to the plaintiffs' share of Spill Act taxes is sufficient. The thrust of this remedy is to make the Spill Fund whole.

In the event the Legislature does not appropriate funds sufficient to reimburse the Spill Fund for the full amount of pre-empted expenditures within such six-month period, the Fund shall refund to the plaintiffs, pro rata, so much of the pre-empted expenditures as bears the same proportion to the total pre-empted expenditures as the Spill Act taxes paid by plaintiffs bears to the total amount of Spill Act taxes collected. In view of the repeal of the cap provisions of the Spill Act as originally enacted, the Tax Court's recommendation in paragraph 4(a) of its Summary is no longer appropriate. —— *N.J.Tax* at —— (slip op. at 39).

For the reasons stated, the recommendations of the Tax Court, as modified by this opinion, are adopted. The matter is

remanded to the Tax Court for further proceedings consistent with this opinion. We do not retain jurisdiction.

*For modification and remandment*—Justices STEIN, CLIFFORD, HANDLER and POLLOCK and Judges PRESSLER and KING—6.

*Opposed*—none.