EXXON CORPORATION,[1] A CORPORATION OF THE STATE OF NEW JERSEY, AND BP AMERICA, INC., A CORPORATION OF THE STATE OF DELAWARE, PLAINTIFFS–APPELLANTS, v. DAVÏD C. MACK, ACTING ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND; RICHARD T. DEWLING, COMMISSIONER OF NEW JERSEY, DEPARTMENT OF

---

[1]Exxon was a party to this appeal but has since adjusted its differences and dismissed its appeal.

ENVIRONMENTAL PROTECTION, AND NEW JERSEY DE-
PARTMENT OF ENVIRONMENTAL PROTECTION, DEFEN-
DANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 18, 1989—Decided November 28, 1989.

18

Before Judges KING, SHEBELL and BAIME.

*John J. DeLaney, Jr.,* argued the cause for appellant BP America, Inc. (*Young, Rose & Millspaugh,* attorneys; *John J. DeLaney* and *Jack L. Litmer,* on the brief).

*Mary C. Jacobson,* Deputy Attorney General, argued the cause for respondents (*Peter N. Perretti, Jr.,* Attorney General, attorney; *Lawrence E. Stanley,* Deputy Attorney General, of counsel; *Mary C. Jacobson,* on the brief).

The opinion of the court was delivered by

SHEBELL, J.A.D.

This appeal involves two questions surrounding the interpretation of the arbitration provisions of the Spill Compensation and Control Act (Act), *N.J.S.A.* 58:10–23.11n(a). The first is whether a draw by the New Jersey Department of Environmental Protection (NJDEP) from the Spill Fund (Fund) constitutes a claim against the Fund, thereby triggering a right to arbitration. The second question is whether the scope of permissible arbitration includes a determination of responsibility for cleanup and removal costs.

On July 7, 1987, the defendant NJDEP issued a directive to 28 separate corporations, including plaintiff BP America, Inc. (BP), requiring them to remove hazardous substances from the Borne Chemical Company (Borne) site in Elizabeth, New Jersey.

The NJDEP's directive also required the named parties to secure the Borne site and to take steps to protect against the possibility of fires, explosions or imminent harm to the environment.

On March 14, 1988, BP formally demanded that the defendant, Acting Administrator of the Environmental Claims Administration (Administrator), on behalf of the Fund, convene an arbitration board pursuant to the Act, *N.J.S.A.* 58:10–23.11n(a), to "challenge the assessments contained in DEP's cleanup Directive for the Borne Site." By letter, dated April 12, 1988, the Administrator rejected BP's demand. On May 19, 1988, BP sent a letter to the Administrator objecting to his rejection of its demand for arbitration and renewing its demand. This demand was also denied.

On May 27, 1988, BP, along with Exxon, filed a complaint in lieu of prerogative writs in the Law Division seeking to compel the Administrator to convene an arbitration board. The defendant NJDEP moved to have the action transferred from the Law Division to the Appellate Division. *See R.* 1:13–4. On September 2, 1988, this matter was ordered transferred to this court.

According to the NJDEP directive, chemical operations on the Borne site were carried out from 1917 until 1984 involving the "blending and mixing of various petroleum hydrocarbons and additives into lubricants, the mixing of tanning and dye products, and packaging and shipping of these and other chemical based products and wastes...." In addition, Borne stored and warehoused various chemical-based products and wastes. During a portion of that time, BP North America Trading, Inc., now part of BP, "utilized the services and facilities of Borne for manufacture, storage and distribution of its chemical-based products and wastes, including hazardous substances."

The NJDEP first identified a pollution problem at the Borne site in 1978. On February 15, 1980, Borne filed a petition for voluntary bankruptcy pursuant to 11 *U.S.C.A.* § 101, *et seq.* (Chapter 11) in the United States Bankruptcy Court for the

District of New Jersey. The Bankruptcy Court authorized the trustee to abandon the site on October 10, 1986. Between 1983 and April of 1985, NJDEP was negotiating with Borne's owners and waste generators to undertake removal and disposal of waste at the Borne site. However, the parties were unable to reach an agreement due to Borne's financial condition.

On April 4, 1985, the State formally requested authorization for $2,375,000 from the Fund for the purpose of sampling, staging, removal and disposal of hazardous waste materials at the Borne site. To date, only $11,743 has been expended from the Fund for the Borne site; apparently for testing and securing estimates for the cost of cleanup. According to representations of the Attorney General, the present status remains as described by the chief regulatory officer, Bureau of Hazardous Waste Enforcement:

> Based upon [a] review of Department files, and upon consultation with representatives of the Administrator of the Spill Compensation Fund, to date [July 13, 1988], there have been no damage claim or claims for cleanup and removal costs presented to the Fund for payment respecting the Borne site. The only expenditures from the Fund to date for the Borne site have resulted from direct draws upon the fund made by the Department, including the amount referenced in Paragraph 14 of the Complaint. Assuming the Directive remains unsatisfied, the Department plans to continue making direct draws upon the Fund to cover projected cleanup expenditures.

The NJDEP issued a directive on July 7, 1987, naming 28 corporations it believed were responsible for removal of hazardous substances at the Borne site. The directive gave notice that failure to perform the required remedial and preventive action within 30 days could result in NJDEP doing the required work with public funds, and that as a result the named parties could be liable for treble damages for work done by NJDEP. The deadline for compliance was extended by NJDEP until December 22, 1987. We are advised that in September of 1989, 18 companies entered into an agreement, entitled Administrative Consent Order II, with NJDEP to comply with the directive.

BP's demand for arbitration requested a determination of the amount of cleanup and removal costs "and allocations of finan-

cial responsibility or contribution made in the Directive by DEP which have been or will be presented to the Spill Fund for payment." BP asserted that it was not responsible for the discharge of any hazardous substance which NJDEP has or will remove from the Borne site. NJDEP's letter rejecting BP's demand stated, "[i]n view of the fact that we have no claims in connection with the site, there is no reason to convene a Board of Arbitration." BP's renewed demand contested the amount of the cleanup and removal costs that NJDEP claimed it would incur, asserting that these amounts "were greater than the Spill Fund Authorization Request for the Borne site which was made in April, 1985." In addition, BP claimed that the basis of NJDEP's rejection—that no claims were made for the Borne site—was incorrect, citing the $11,743 drawn from the Fund by NJDEP for the Borne site.

In its complaint in lieu of prerogative writs, BP pointed to the disparity in estimates received by NJDEP and estimates received by BP for removal and cleanup of the Borne site. As support for its claim for arbitration, BP cited the mandatory conditions for the convening of a board of arbitration under *N.J.S.A.* 58:10–23.11n(a).

Although BP had previously raised as an issue the reasonableness of the projected cost of cleaning up the Borne site, on appeal to this court it has stated that it "withdraws its request to arbitrate the future projected costs." "BP simply seeks to arbitrate the reasonableness of the funds presented for payment to the Fund and whether it is a responsible party under the Act." BP has made it clear that its true interest is to arbitrate its responsibility for the discharge of hazardous substances at the Borne site, and it requests that we decide this issue because of the important public policy involved.

## I.

We are called upon to interpret the Act's arbitration provision, *N.J.S.A.* 58:10–23.11n(a), which provides:

Boards of arbitration shall be convened by the administrator when persons alleged to have caused the discharge, the administrator or other persons contest the validity or amount of damage claims or cleanup and removal costs presented to the fund for payment. If the source of discharge is not known, any person may contest such claims presented for payment to the fund.

There are three conditions that must exist before arbitration may occur: (1) there must be a demand for arbitration; (2) there must be a claim presented to the Fund for damage or cleanup and removal costs, and (3) someone must contest the validity or amount of the claim presented to the Fund.

BP asks us to conclude that a claim has been presented to the Fund by NJDEP on the basis that NJDEP has drawn $11,743 from the Fund for testing and securing estimates for the cost of cleanup at the Borne site. BP considers NJDEP's use of these funds to be equivalent to a claim presented to the Fund within the meaning of *N.J.S.A.* 58:10–23.11n(a). Therefore, BP argues that because it is a party alleged to have caused discharge, and because the NJDEP has used money from the Fund, BP is entitled to the convening of a board of arbitration. Thus, BP wishes to use NJDEP's drawing of monies from the Fund as a triggering event for an arbitration proceeding.

Where a statute's meaning is not plain, whether because it is ambiguous or does not strictly apply to a case at hand, a court may go beyond the language of the statute to determine meaning. *Kimmelman v. Henkels & McCoy, Inc.,* 108 *N.J.* 123, 128 (1987); *Coletti v. Union Co., C. Freeholders,* 217 *N.J.Super.* 31, 35 (App.Div.1987) (sources of intent include statute's language, policy, legislative history and concepts of reasonableness); *Matter of Board of Educ. of Town of Boonton,* 99 *N.J.* 523, 534 (1985), *cert.* den. 475 *U.S.* 1072, 106 *S.Ct.* 1388, 89 *L.Ed.* 2d 613 (1986) (court generally defers to administrative agency's interpretation of statute it is charged to enforce).

In enacting the Act the Legislature stated:
that the discharge of petroleum products and other hazardous substances within or outside the jurisdiction of this State constitutes a threat to the economy and environment of this State. The Legislature intends by the

passage of this act to exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damages by such discharge. [*N.J.S.A.* 58:10–23.-11a].

The New Jersey Supreme Court has interpreted this language to mean that the Act's purpose is "to finance prevention and cleanup of oil spills and hazardous substance discharges because of their adverse effects on the state's environment and economy." *Exxon Corp. v. Hunt*, 109 *N.J.* 110, 114 (1987). The Act is remedial in nature and therefore should be liberally construed for the purpose of accomplishing its remedial purpose. *N.J.S.A.* 58:10–23.11x; *GATX Term. Corp. v. Environmental Prot. Dep't*, 86 *N.J.* 46, 52 (1981).

The NJDEP is authorized to "draw upon the money available in the [Fund] .... to pay promptly for all cleanup costs incurred by the department in removing or in minimizing damage caused by [a] discharge." *N.J.S.A.* 58:10–23.11f(a). The Fund is strictly liable for all cleanup and removal costs and damages including the cost of restoring natural resources, lost income, loss of tax revenue and interest on loans obtained by a claimant for ameliorating the adverse effects of a discharge. *N.J.S.A.* 58:10–23.11g. *N.J.S.A.* 58:10–23.11o authorizes the NJDEP to spend money from the Fund to meet costs incurred under *N.J.S.A.* 58:10–23.11f and *N.J.S.A.* 58:10–23.11g. Moreover, NJDEP is authorized to spend money from the Fund for research and operational costs. *N.J.S.A.* 58:10–23.11o (3) and (4). The Legislature stated that the NJDEP should act promptly when responding to discharges of hazardous substances. *See N.J.S.A.* 58:10–23.11a; *N.J.S.A.* 58:10–23.11f.

The overall scheme of the Act implies that the NJDEP is authorized to spend money from the Fund without the expenditure being considered a claim presented to the Fund. *See, e.g., N.J.S.A.* 58:10–23.11f; *N.J.S.A.* 58:10–23.11o. Here, the NJDEP drew $11,743 from the Fund for the purpose of con-

ducting tests at the Borne site, and determining the costs of cleaning up the site. Even if the NJDEP draws money from the Fund for the direct purpose of cleanup and removal, we conclude this does not constitute "damage claims or cleanup and removal costs presented to the fund for payment." *N.J. S.A.* 58:10–23.11n(a). *N.J.S.A.* 58:10–23.11f(a) authorizes NJDEP to draw from the Fund for the purpose of removing discharge or "to secure prospective removal services." This is in contrast to *N.J.S.A.* 58:10–23.11k, entitled "claims; limitations; ... [etc.]," which refers to "claimants" and provides that "claims" must be filed with the Administrator, within certain prescribed time periods. It is clear that NJDEP is not to be considered a "claimant" within the intendment of the Act.

The language of various other provisions of the Act also suggest that claims against the Fund are those made by independent third-parties. *See, e.g.,* and *compare N.J.S.A.* 58:10–23.11k; *N.J.S.A.* 58:10–23.11*l*; *N.J.S.A.* 58:10–23.11m; *N.J.S.A.* 58:10–23.11p; *N.J.S.A.* 58:10–23.11q; *N.J.S.A.* 58:10–23.11r; *N.J.S.A.* 58:10–23.11u (methods of making claims, settlement and disbursements from Fund) *with N.J.S.A.* 58:10–23.11f; *N.J. S.A.* 58:10–23.11*o* (authorization of direct draws by NJDEP from Fund). These various sections of the Act provide that the Administrator act as an intermediary between claimants, parties responsible for discharge and the Fund. *See N.J.S.A.* 58:10–23.11*l*; *N.J.S.A.* 58:10–23.11n. The Administrator is permitted to make decisions concerning the disbursement of monies from the Fund and to use money from the Fund to ensure prompt cleanups. *See N.J.S.A.* 58:10–23.11g. Thus, it appears from the overall scheme of the Act that the Administrator has a role that distinguishes him from third-party claimants.

Here, there was no third-party claiming damages or costs from the Fund. *See, e.g., Township of South Orange Village v. Hunt,* 210 *N.J.Super.* 407 (App.Div.1986). The NJDEP drew monies directly from the Fund to cover costs related to the eventual cleanup and removal of hazardous substances at the Borne site. This type of draw is consistent with the authoriza-

tion to spend monies found in *N.J.S.A.* 58:10–23.11f. We conclude this type of draw by NJDEP does not constitute a claim against the Fund.

As outlined above, our overall reading and common-sense interpretation of the scheme of the statute, *see King by King v. Brown,* 221 *N.J.Super.* 270, 275 (App.Div.1987), satisfies us that the Legislature did not intend NJDEP draws on the Fund to entitle dischargers to a right to arbitration under *N.J.S.A.* 58:10–23.11n. Therefore, the prerequisite condition of *N.J.S.A.* 58:10–23.11n—demand for costs made against the Fund—has not been met. Consequently, BP is not entitled to the convening of a board of arbitration.

## II.

We next consider whether, pursuant to *N.J.S.A.* 58:10–23.11n(a), arbitration is appropriate for determining responsibility for cleanup and removal cost in addition to contesting the reasonableness and validity of those costs if and when they are claimed by parties other than NJDEP. NJDEP maintains that plaintiff is precluded from arbitrating its responsibility for cleanup and removal costs under our Supreme Court's holding in *Matter of Kimber Petroleum Corp.,* 100 *N.J.* 69, app. dism. *sub nom., Kimber Petroleum Corp. v. Daggett,* —— *U.S.* ——, 109 *S.Ct.* 358, 102 *L.Ed.*2d 349 (1988).

In *Matter of Kimber,* the Court addressed the constitutionality of the Act and, in particular, the Act's provision for treble damages in cases where parties refuse to comply with NJDEP directives. *Matter of Kimber,* 110 *N.J.* at 72–73. The Court stated, "[d]ue process standards arguably call for a right to challenge the validity of a legislative or administrative order without facing the possibility that one will incur a greater penalty if such challenge is unsuccessful than the loss resulting from such an order if left unchallenged." *Id.* at 80. The *Kimber* Court found that although the "individual components" of the Act's enforcement framework did not offend the require-

ments of due process, the "combined weight" of its various provisions "and the imposition of punishment in the form of treble damages upon failure to comply—even if such failure is predicated upon a reasonable defense ..." was beyond constitutional tolerance. *Id.* at 80–81, 83. Thus, the Court held that the imposition of treble damages was subject to good-cause defenses. *Id.* at 83, 86. The Court also held that a good-cause defense may also include challenges to the reasonableness of costs assessed by NJDEP. *Id.* at 86.

The Court, however, stated that "[a] good-cause defense is relevant only once a company refuses to comply with a DEP directive and DEP moves in court to enforce the directive." *Id.* at 84. We believe it is apparent that the Court did not think it necessary that a party receive a hearing as to its responsibility, or the reasonableness of costs, before it chooses whether to comply with NJDEP's directive. *See id.* at 79, 84. The language of *N.J.S.A.* 58:10–23.11n(a) is clear and direct regarding the scope of arbitration. Further, *N.J.S.A.* 58:10–23.11q requires that the Fund administration prove responsibility for the unlawful discharge in the Superior Court after instituting an action to seek satisfaction from the responsible party. This is sufficient protection for any party improperly charged.

We recognize that in *Matter of Kimber* the Court noted that it thought the scope of the arbitration powers was "clearly broad enough to cover and challenge the validity of any aspect of a directive." 110 *N.J.* at 79, n. 4. However, the scope of arbitration in *Kimber* in no way affected or concerned the outcome. The Court's discussion in footnote four of the scope of arbitration under *N.J.S.A.* 58:10–23.11n(a) thus was not pertinent to its holding and is therefore dictum, as is our present holding on the issue. In our case the question has been fully briefed and argued. We feel it warrants our comment because of its importance and because it is conceivable that in the future there may be claims relating to the Borne site.

Arbitration under *N.J.S.A.* 58:10–23.11n(a) is for the purpose of contesting "the validity or amount of damage claims or cleanup and removal costs presented to the fund for payment." Nowhere does the statutory language suggest that responsibility for cleanup or removal is an arbitrable issue. *N.J.S.A.* 58:10–23.11n(a) provides for arbitration only in cases where parties dispute the validity or amount of claims that have been presented to the Fund. Thus, the arbitration procedure found within *N.J.S.A.* 58:10–23.11n(a) was not designed for resolving questions of responsibility. Therefore, plaintiff must await an enforcement action by NJDEP before it can raise issues regarding its responsibility.

BP argues that arbitration of the question of responsibility would facilitate the public policy of swift cleanups, referring to several decisions where arbitration was preferred as an expeditious method of dispute settlement. *See, e.g., Barcon Associates v. Tri–County Asphalt Corp.,* 86 *N.J.* 179 (1981); *Kalman Floor Co., Inc. v. Jos. L. Muscarelle, Inc.,* 196 *N.J.Super.* 16, 26 (App.Div.1984), aff'd, 98 *N.J.* 266 (1985). Although arbitration is generally favored in New Jersey, *see Barcon Associates,* 86 *N.J.* at 186, the unique statutory scheme presented by the Act makes the issue of responsibility ripe for arbitration only under the specified conditions of the statute. *See N.J.S.A.* 58:10–23.11n(a).

While arbitration certainly provides a speedy and inexpensive route to settling controversies, *Barcon Associates,* 86 *N.J.* at 187, the public policy concerns behind the Act require that cleanups be commenced before the question of responsibility is resolved. *See Superior Air Prod. v. NL Industries,* 216 *N.J. Super.* 46, 61–62 (App.Div.1987). Arbitration of the issue of responsibility prior to cleanup or during cleanup would result in a delay in cleanups or a depletion of Fund monies as payment of claims may not take place "sooner than 30 days after the determination of the arbitrators." *See N.J.S.A.* 58:10–23.11n(h). In light of the urgency presented by most discharge situations, and the policy goals of the Act, arbitration of ques-

tions of responsibility would not be consistent with the public policy behind the Act.

We hold that, because presentment of a claim to the Fund is a necessary prerequisite to arbitration, plaintiff is not entitled to arbitrate any of its challenges to the NJDEP directive at this time. If the Fund does receive a claim for payment against the Fund from a third party, then plaintiff should only be allowed to arbitrate the amount and/or validity of the claim presented.

Affirmed.

BAIME, J.A.D., concurring.

I am in complete accord with the views expressed in Part I of Judge Shebell's thorough opinion. Specifically, I agree that the NJDEP's draw upon the monies of the Fund does not trigger arbitration proceedings. Although the statutory scheme is not a model of clarity, the clearly expressed legislative design is to confer upon the NJDEP the authority to take immediate corrective action when confronted with potential or ongoing environmental harm. Our construction of the statute is consonant with this legislative goal.

I perceive no need to resolve questions that are not directly before us concerning the appropriate parameters of arbitration under the statutory scheme. I would save for another day issues pertaining to the metes and bounds of the arbitration remedy.